IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 12, 2005 Session

## GENUINE AUTO PARTS COMPANY
v.
## CONVENIENT CAR CARE, INC., DAN BABB ENTERPRISES, INC.,
### AND DAN BABB, INDIVIDUALLY

**An Appeal from the Circuit Court for Shelby County**
**No. CT-002843-01    Rita L. Stotts, Judge**

---

**No. W2004-00615-COA-R3-CV - Filed June 28, 2005**

---

This is a collection action. The defendant corporation owned an automotive repair shop. In order to obtain a line of credit to purchase automobile parts from the plaintiff auto parts supply company, the sole shareholder of the defendant corporation signed a personal guaranty. After the corporation had incurred about $20,000 on its line of credit, the plaintiff supply company filed this lawsuit against the corporation and the individual shareholder to recover that debt. The shareholder argued that, before the debt was incurred, he sold the business to a third party and canceled his personal guaranty on the debt of the corporation. The trial court rejected that argument and entered a judgment in favor of the plaintiff against both the corporation and the shareholder. The shareholder now appeals. We affirm, concluding that holding the shareholder liable for the debt of the corporation is appropriate under these circumstances, regardless of whether his personal guaranty remained intact.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J.,W.S., and DAVID R. FARMER, J., joined.

Joseph E. Garrett, Memphis, Tennessee, for the appellant, Dann Babb.

Larry E. Killebrew, Memphis, Tennessee, for the appellee, Genuine Auto Parts Company.

**OPINION**

Plaintiff/Appellee NAPA Auto Parts, Inc., a division of Genuine Auto Parts Company ("NAPA"), is in the business of selling automobile parts to retail stores. Defendant/Appellant Convenient Car Care, Inc. ("CCC"), was a corporation engaged in the business of providing

automobile repair services through a single retail store called Convenient Car Care. CCC was solely owned by Defendant/Appellant Dan Babb ("Babb").

On February 12, 1988, Babb submitted a credit application to NAPA on behalf of CCC, seeking approval for a line of credit with NAPA. In the application, Babb agreed to guarantee personally all the debts of CCC to NAPA. That application was accepted, and it became the agreement under which NAPA sold auto parts to CCC on credit.

On September 1, 1999, Babb entered into a Lease/Purchase Agreement ("Agreement") with Ronnie Smith ("Smith") to sell CCC to Smith. The Agreement was drafted by Babb, who is not a lawyer. In the Agreement, Smith was to pay Babb $1,500 each week for forty-eight (48) months, and at the end of the 48-month period, Smith would own CCC "in its entirety." The Agreement provided, in the meantime, that Babb would continue to pay the building lease and the telephone bill for the business until December 31, 2002. The Agreement further provided, "If Ronnie Smith defaults for any reason[,] possession and ownership of Convenient Car Care, Inc. is returned to Dan Babb in its entirety without any penalty to Dan Babb and all equipment, receivables and goodwill will be returned to Dan Babb."

Thereafter, Babb and Smith sent a letter, dated January 1, 2000, to NAPA informing NAPA that Babb had entered into the Agreement, and that Smith would own CCC in its entirety at the end of the four-year period. The letter attempted to revoke Babb's guaranty of NAPA's line of credit to CCC and absolve Babb of any personal liability to NAPA. The letter stated:

> It has been agreed that during this [Lease/Purchase Agreement] that payables after September 1, 1999 will be the responsibility of Ronnie Smith. Dan Babb will not be responsible for any debt due creditors after August 31, 1999. Dan Babb will not be liable for any new debt from present creditors or new debts or creditors after August 31, 1999.
>
> Dan Babb is very grateful for your allowing credit from your company for the many years we have been in business. Ronnie Smith will continue to be grateful for your continued support and for your continued credit line.

Smith did not apply for his own line of credit with NAPA, but continued to receive credit for CCC from NAPA through the original line of credit procured by Babb.

In August 2000, without any prior notice to Babb, Smith abandoned the CCC business and stopped making the $1,500 per week payments. Also in August 2000, Smith filed a Chapter 7 bankruptcy petition in federal court. In Smith's bankruptcy petition, he listed Convenient Car Care, Inc. as a trade name, and listed both NAPA and Babb as creditors in the bankruptcy estate.

On November 30, 2000, NAPA filed a civil warrant in the General Sessions Court of Shelby County against CCC, Dan Babb Enterprises, Inc. ("Babb Enterprises"), and Dan Babb, individually,

for $21,211.36 due on account from CCC to NAPA. On April 2, 2001, the General Sessions Court entered a judgment in favor of NAPA against CCC. The General Sessions Court held in favor of Babb Enterprises and Dan Babb, individually.

On April 11, 2001, NAPA appealed the General Sessions' judgment to the circuit court below for a trial *de novo*. On January 12, 2004, the circuit court conducted a trial in the matter. The parties stipulated that the amount of debt in question was $21,211.36, and that a judgment in that amount should be entered against CCC. At issue was whether Dan Babb, individually, should be held liable for the debt of CCC.

Two witnesses testified at trial, a NAPA representative and Babb. The first was the NAPA representative, Jerry Hjelle ("Hjelle"), who was the credit and collections manager for NAPA during the relevant time period. Hjelle identified the credit application signed by Babb in February 1988, and said that the state tax identification number listed by Babb on the application was the only number given to NAPA. He also identified a statement listing CCC's charges from NAPA and showing that CCC owed NAPA $21,211.36 for parts, services, tools, and some amount of interest. Hjelle said that the delinquent payments had been incurred between April and August 2000, and commented that NAPA had stopped charging CCC interest "a long time ago." Hjelle said that he had always dealt with Smith and understood him to be CCC's manager. In his testimony, Hjelle referred to the shop after Smith's disappearance as "the collapse of this Convenient Car Care." He said he visited the business after Smith's departure and met Babb for the first time. At that time, Hjelle said, the place "was slammed shut," and Babb gave him a copy of the January 1, 2000 letter informing NAPA of his Lease/Purchase Agreement with Smith, along with a copy of the Agreement, and apparently indicated to Hjelle that Smith, not Babb, owned CCC. Hjelle said that this was the first time he had seen the letter and Agreement.

Babb was called by NAPA to testify in NAPA's case-in-chief. When questioned about the formation of his wholly owned corporations, CCC and Babb Enterprises, Babb said that they were incorporated for him in 1987 by his accountant, Vance Robertson ("Robertson"). He said that Babb Enterprises, although formed in 1987, was not "used" until 1999. Babb explained that Babb Enterprises was incorporated because "[Robertson] just suggested why don't we do Dan Babb Enterprises, Incorporated. You may want to use it one day." So, according to Babb, Babb Enterprises remained dormant until 1999, after the Agreement with Smith. In 1999, Babb opened a bank account in the name of Babb Enterprises, and used the Babb Enterprises account for all of his business transactions. Babb claimed that separate corporate books were kept for CCC by Robinson, but conceded that CCC did not have its own bank account after the bank account in the name of Babb Enterprises opened in1999.

Babb was also questioned about his Agreement with Smith. Babb explained that, under the Agreement, Smith was to pay him $1,500 per week, and Babb was to continue to pay CCC's lease and its phone bill. In addition, Babb was permitted to maintain his own office at the CCC auto shop out of which he could operate another of his corporations, Just in Time Transportation ("Just in

Time").[1] Babb also continued to pay the remaining payments due from CCC on the company's Mitchell-on-Demand system, a diagnostic system for computerized cars. Babb said that Smith stopped making the required $1,500 per week payments under the Agreement when he filed his bankruptcy petition in August 2000. Under the terms of the Agreement, Babb said, when Smith stopped making the payments, the receivables, equipment, and goodwill of CCC belonged to Babb. In addition, Babb admitted that, after Smith left CCC, Babb told one of the remaining employees to continue to do repairs under Babb Enterprises. Babb explained this action, saying that some customers depended on the repair shop for "fleet type repair," and he was still obligated under the lease, so he continued to allow repair work to be done. Babb said that, after Smith left CCC, Babb received approximately $1,945.73 in the mail at CCC. This money was deposited into the Babb Enterprises bank account. Thus, after Smith left CCC, the automobile repair store continued doing business, and any income received went into the bank account for Babb Enterprises.[2]

When asked if he was the owner of CCC during that entire time, Babb responded, "I don't know how to answer that. In my opinion Ronnie Smith was the owner of [CCC] because he paid the notes to me up through [August]." At another point in his testimony, however, Babb indicated that, under the Agreement, ownership of CCC would transfer from him to Smith after the four year period of payments, "once we finished the agreement." When asked directly whether Smith would be the owner of CCC only after he made payments for four years under the Agreement, Babb answered, "Yes, sir." Babb was asked whether he "still owned the company 100 percent" when the January 2000 letter was supposedly written, and Babb responded, "Yes, sir, but I wanted to remove my personal guaranty. That is what this letter says to remove me personally . . . ." Babb said that he wanted NAPA to allow Smith to use Babb's line of credit with NAPA.

Babb asserted that he knew that an employee of NAPA, with whom he had done business for several years, had received the January 1, 2000 letter he sent to NAPA to cancel his personal guaranty. Babb said that he believed that, by writing the letter, he had relieved himself of liability on his guaranty to NAPA.

Babb was also asked about the corporate status of CCC. Babb stated that CCC used the state tax identification number for Babb Enterprises from 1999 until CCC stopped doing business in August 2000. When asked why CCC used the tax number of Babb Enterprises, a corporation "which was just sitting there and didn't do anything," Babb asserted that CCC became "non-existent" in 1999 because "[i]t dissolved." When asked how it dissolved, Babb stated that he assumed that, when Smith filed bankruptcy in August 2000, "it was no longer Convenient Car Care." Babb said he did not know whether the corporate charter for CCC had been surrendered. He claimed that Smith had the records for CCC, and that he did not know what was reflected in those records. Babb maintained

---

[1] The nature of the business conducted through Just in Time Transportation is unclear in the record, but Babb indicated in his testimony that it involved "the air industry."

[2] By the time of trial, Babb said, he was no longer in the automotive care business. He said that he owned a memorabilia store, the proceeds from which he deposited into his Babb Enterprises bank account.

that he kept "separate books" for each corporation in which he was involved, but conceded that all of the businesses operated out of the same bank account under the name of Babb Enterprises. Babb said that the accountant, Robertson, took minutes for the corporations once a year and filed the tax returns. However, Babb said that tax returns were not filed on each individual corporation, but instead were filed under Babb Enterprises.

At the conclusion of the trial, the trial court requested further briefing from the parties and scheduled a hearing at which the court would issue its ruling. On January 23, 2004, NAPA filed a brief in which it argued that Babb, individually, should be held responsible for CCC's debt in his capacity as a personal guarantor and also in his capacity as the principal shareholder of CCC, characterizing CCC as a sham corporation. NAPA argued that disregarding the corporate entity, i.e., piercing the corporate veil, was warranted under the facts of this case.

On February 3, 2004, the trial court issued an oral ruling holding that both CCC and Babb, individually, were liable to NAPA for the $21,211.36 amount claimed. The trial court did not elaborate on its reasoning, but stated that liability was "based primarily on an exhibit that was entered in this cause, the application for credit that Dan Babb individually is also responsible [for the debt]." The trial court found in favor of Babb Enterprises, however, stating that there was no basis on which to hold that entity liable for CCC's debt. On February 13, 2004, the trial court entered a written order consistent with its oral ruling. From that order, Babb now appeals the judgment against him individually. The judgment against CCC was not appealed.

On appeal, Babb argues that the trial court erred in holding him individually liable for the debt of CCC. He relies on the January 1, 2000 letter sent to NAPA, claiming that the letter properly informed NAPA that he intended to sell CCC to Smith and canceled his personal guaranty of CCC's line of credit. He argues that the language in his credit application to NAPA allows him to cancel his personal guaranty, so long as he does so in writing. Because he canceled his personal guaranty before the past-due purchases were made by CCC, Babb argues, he should not be held individually liable for CCC's debt. NAPA, on the other hand, argues that the trial court's decision should be affirmed on one of two grounds. First, NAPA claims, the trial court correctly held that Babb was liable as a personal guarantor under CCC's credit agreement with NAPA, since his personal guaranty on the line of credit was not properly canceled. Second, NAPA argues, Babb should be held liable for CCC's debt because CCC was solely owned by Babb at all pertinent times, and because the circumstances warrant disregarding the corporate entity.

Because this case was tried by the trial court without a jury, the trial court's findings of fact are reviewed *de novo*, with a presumption that those findings were correct unless the evidence preponderates otherwise. *VP Buildings, Inc. v. Polygon Group, Inc.*, No. M2001-00613-COA-R3-CV, 2002 WL 15634, at *4 (Tenn. Ct. App. Jan. 8, 2002); Tenn. R. Civ. P. 13(d). The trial court's conclusions of law are reviewed *de novo*, with no presumption of correctness. *See State v. Levandowski*, 955 S.W.2d 603, 604 (Tenn. 1997).

At issue in this appeal is whether NAPA should be permitted to pierce the corporate veil and collect from Babb the indebtedness of CCC on that basis. In addition, we are asked to determine whether Babb remained liable for CCC's debt pursuant to the personal guaranty given to NAPA. We address first the issue of whether it would be appropriate in this case to pierce the corporate veil and hold Babb liable for CCC's debt on that basis.

In Tennessee, there is a strong presumption in the law that a corporation is a distinct legal entity, wholly separate and apart from its directors officers and shareholders. *Amanda Constr., Inc. v. White*, No. W2004-00521-COA-R3-CV, 2004 WL 2752805, at *2 (Tenn. Ct. App. Dec. 1, 2004). "In an appropriate case and in furtherance of the ends of justice, the separate identity of a corporation may be discarded and the individual or individuals owning all its stock and assets will be treated as identical to the corporation." *VP Buildings*, 2002 WL 15634, at *4. Piercing the corporate veil "is appropriate when the corporation is liable for a debt but is without funds to pay the debt, and the lack of funds is due to some misconduct on the part of the officers and directors." *Id.* Though the principle of piercing the corporate veil must be applied with great caution, "[o]ur courts will disregard the corporation as a separate entity upon a showing that the corporation is a sham or dummy or such action is necessary to accomplish justice." *Id.* at *5 (citing cases). The burden is on the party seeking to negate the existence of the corporation to prove facts sufficient to justify piercing the corporate veil. *Id.*; *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991).

Generally, no one factor is conclusive in determining whether or not to pierce the corporate veil; rather, a combination of factors must be considered and be applied in light of facts in each individual case. Some factors to be considered are:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors . . .; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among entities.

*Amanda Constr.*, 2004 WL 2752805, at *2–*3 (quoting *F.D.I.C. v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984) (citations omitted)); *see also Money & Tax Help, Inc. v. Moody*, No. E2004-00191-COA-R3-CV, 2005 WL 263872, at *5 (Tenn. Ct. App. Feb. 3, 2005) (listing factors).

NAPA argues that CCC is merely a shell corporation, an instrumentality through which Babb conducted his personal business, and that therefore Babb should be held individually liable for CCC's debts. In support of its argument, NAPA relies on the reasoning in *VP Buildings*, *supra*. In *VP Buildings*, the trial court had held the sole shareholder liable for the corporation's debt

because she abused the corporate form. *VP Buildings*, 2002 WL 15634, at *1. In affirming the trial court's holding, the appellate court recounted the history of the corporation and the shareholder's disregard for the corporate form. The appellate court noted that the corporation was initially capitalized with only $500, a gross undercapitalization under the circumstances. The sole shareholder was the sole director and president of the corporation. All of the corporation's minutes for the seven years preceding the year in which the dispute arose were documented by a computer-generated repetition of the minutes of the year before. In addition, the corporation was incorporated under the laws of Kentucky, and was not licensed to do business in Tennessee. In 1996, the State of Kentucky had administratively dissolved the corporation for failure to file annual reports, which went unfiled for several years. While the corporation lost money year after year, the sole stockholder continued to pay herself and her husband large salaries. *Id.* at *2.

The appellate court in *VP Buildings* observed that, after the shareholder was sued personally, "she got her corporate records in correct order" and filed annual reports for 1996 through 1999 and had the corporation reinstated. She then borrowed $300,000 against the corporation's only asset, a building, and could not account for how the funds were used. *Id.* The appellate court found that the shareholder had abused the corporate form and that her failure to file annual reports or pay the filing fees showed a complete disregard for the corporate entity. *Id.* at *7. The court noted the lack of any evidence to justify her actions. The court stated that "this record is impressive – not from the facts revealed therein, but from the lack of facts revealed." *Id.* (quoting *Muroll Gesellschaft M.B.H. v. Tennessee Tape, Inc.*, 908 S.W.2d 211, 214 (Tenn. Ct. App. 1995)). Accordingly, the *VP Buildings* court determined that the corporation was a mere instrumentality for the sole shareholder, that the sole shareholder had abused the corporate form to the extent that the corporation was a sham, and that disregarding the corporate entity under the circumstances was necessary to accomplish justice. *Id.*

In this case, as in *VP Buildings*, there is virtually no evidence that CCC existed as a corporation separate and apart from Babb's personal business or the auto repair store that shared its name. In the face of NAPA's assertion that CCC was a sham corporation, Babb offered no evidence to rebut NAPA's proof at trial. Considering the pertinent factors, we must conclude that the evidence shows convincingly that CCC was merely a shell corporation and an instrumentality for Babb. It is telling that, prior to 1999, Babb Enterprises, according to Babb, had been "just sitting there" for eleven years, and that when Babb opened a bank account in the name of Babb Enterprises, it appears to have been used as Babb's personal business account, without regard for which corporation earned the amounts deposited or incurred the expenses paid. Babb stated that all of his businesses were controlled by him out of the office space he retained at the automobile repair store. Though Babb asserted that separate books were kept for CCC, he admitted that, after 1999, CCC, Babb Enterprises, and Just in Time Transportation, all corporations owned solely by him, were operated out of the same bank account under the name of Babb Enterprises. Babb conceded that no separate tax returns were filed for the corporations, but rather tax returns for all were filed under the name of Babb Enterprises. Babb offered no evidence of any system by which the operating funds of CCC were separately accounted. At times in his testimony, Babb contradicted himself, first admitting that he owned CCC "100 percent" in January 2000 when he wrote the letter to NAPA, but

later asserting that the CCC had "dissolved" in 1999, or at least when Smith filed bankruptcy in August 2000. Moreover, Babb testified that the tax identification number given to NAPA for the line of credit was the tax identification number of Babb Enterprises, not CCC. No evidence was submitted to show that the proper annual corporate filings were made, that proper minutes were kept, or that proper taxes and fees were paid. Clearly, through Babb's testimony, NAPA sustained its burden of proof that CCC was a sham or a dummy corporation, used merely as an instrumentality, for Babb personally. Under these circumstances, where the corporation is a sham or a dummy, or merely the instrumentality of its principal, the corporate form may be disregarded and the principal shareholder may be held liable for the corporation's debt. *See VP Buildings*, 2002 WL 15634, at *4–*5.

Babb argues that Smith, not he, was the owner of CCC between April and August 2000, when CCC incurred the debt for which NAPA seeks payment. Under the plain terms of the Lease/Purchase Agreement, however, Smith did not become the owner of CCC until the end of the 48-month period. The Agreement provided that, if Smith stopped paying under the terms of the agreement, the assets of CCC would return to Babb. While Babb's testimony on his understanding of the Agreement was somewhat contradictory, he recognized that Smith did not own CCC immediately upon signing the September 1999 Lease/Purchase Agreement. When Babb was asked whether he (Babb) owned CCC 100% at the time he wrote the January 2000 letter to NAPA, he responded, "Yes, sir, but I wanted to remove my personal guaranty. That is what this letter says to remove me personally . . . ." Thus, even assuming *arguendo* that the January 2000 letter effectively canceled Babb's personal guaranty on CCC's line of credit to NAPA, Babb was still the sole shareholder in CCC at that time. Therefore, if the circumstances warrant piercing the corporate veil, Babb could be held liable CCC's debt as the principal shareholder. In this case, we must conclude that the circumstances fully warrant piercing the corporate veil, thus justifying the trial court's decision that Babb, as the sole owner, should be held personally liable for CCC's debt. Although it is somewhat unclear whether the trial court's decision was based on piercing the corporate veil or on Babb's personal guaranty to NAPA, we affirm the trial court's ruling based on piercing the corporate veil.[3] This holding pretermits the issue of whether Babb remained liable to NAPA under the personal guaranty, or whether the personal guaranty was properly canceled by Babb.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Dan Babb, individually, and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[3] *See Pendleton v. Mills*, 73 S.W.3d 115, 131 & n.28 (Tenn. Ct. App. 2001) (recognizing that the court of appeals may affirm the trial court's decision on grounds different from those relied upon by the trial court).